**Public Comment of Lee C. Cheng, Chief Legal Officer of Newegg Inc., Regarding the FTC and DOJ Investigation of "Patent Assertion Entities"**

I.   Background of Newegg Inc.

I am the Chief Legal Officer of Newegg Inc., which is an online-only retailer operating via www.newegg.com. Newegg has been very successful in recent years, having grown from a small company building and selling computers out of a warehouse in 2001 to a multi-billion dollar online retailer today. Newegg's primary product categories are computers, computer components and accessories, and consumer electronics. Our excellent selection, expertise, and customer assistance in this area makes Newegg especially popular among information technology professionals and computer hobbyists.

Newegg is successful for three primary reasons. First, Newegg offers outstanding customer service that receives numerous awards every year. Newegg goes to great lengths to ensure that a customer's experience is top notch. Newegg fulfills orders in an incredibly fast manner via its sophisticated logistics systems, and it offers tremendously fast shipping to its customers, often on the same day the order is placed. Newegg also provides the high caliber and detailed technical information that our customers need and appreciate about our products. We liberally accept returns and provide replacement products to customers that are in any way dissatisfied. In many cases, Newegg goes above and beyond the benefits afforded by the manufacturer's warranty or even our own return policy.

The second reason that Newegg is successful is our low pricing. Newegg offers fiercely competitive prices on its products. Our ability to do so stems from two sources. First, Newegg deals directly with many of its suppliers to avoid the markups that inevitably arise when unnecessary distributors exist in a supply chain. Second, Newegg intentionally operates at razor-thin profit margins. We believe that we should do what is right by our customers first and the rest will fall into place. Therefore, we are a frugal company in terms of spending on ourselves—the vast majority of our profits are reinvested into the company to improve our customers' experiences.

Finally, Newegg is successful because we are built on principles of integrity and honesty. This is reflected in our customer service and pricing discussed above, but these principles genuinely permeate our entire organization and corporate philosophy. Our goal is, and always has been, to provide the best, most fair, and most honest service that we can—not to simply make a profit. Our customers' loyalty and enthusiasm for Newegg is a testament that we are achieving this goal. Indeed, approximately 70% of our sales are made to repeat customers.

II.   Newegg's Website

Newegg's website undoubtedly contributes to its success. As an online-only retailer, our website is our store, and without it we could not sell anything.

Our website includes dozens—if not hundreds—of useful features that make the shopping experience on www.newegg.com excellent. Our customers have many different ways to search for and browse our products, as well as compare products. We make it easy to obtain detailed information and tutorials about products, both from Newegg and from our community of Newegg customers who provide helpful comments and reviews of products on our website. There are many ways that we try to help our customers learn about products that they might like, including promotions and special offers. We also provide recommendations to our customers based on products that they have bought in the past or are presently considering for purchase during their browsing experience. There are various convenient ways for our customers to pay for their products. Additionally, email newsletters, text message promotions, gift cards, and even personal credit lines are among the many, many benefits that we make available to our customers.

Newegg's website is built on highly advanced technology, sophisticated architecture, and powerful software that enable complex shopping and buying functions to be performed seamlessly and at record-setting speeds. The website systems and functions overall are developed, operated, and maintained internally by Newegg at tremendous cost and effort. Importantly, all of this is done with a website that has a streamlined interface and a sophisticated look and feel that instills confidence in our customers that they are conducting business with a reliable and reputable retailer.

Despite the advanced technology we use to power our website, Newegg is not a software company. We are not in the business of developing software for sale to others. First and foremost, Newegg is a retailer. A significant portion of the software used to power our website is licensed from third parties that provide us with innovative tools used to design, develop, deploy, and maintain our sophisticated e-commerce platform. These third parties include major players in the software and hardware market, such as Microsoft, Oracle, and Citrix, among others, as well as smaller companies who provide other technology useful for our business. Virtually all of the software solutions that we license are protected by intellectual property rights, including patents. Patents allow these companies to protect their research and development investment and add value to the software products they provide to their customers. I often refer to these companies as "solution providers" in the sense that they couple their intellectual property rights with a viable product that provides solutions responsive to their customers' needs.

III.   "Patent Trolls" and Their Single-Feature Theory of Success

Apparently for no reason other than Newegg's success and perceived deep pockets, Newegg has been sued many times by so-called "patent assertion entities" that are solely in the business of enforcing and licensing patents. Some of these cases have resulted in settlements. Others have resulted in jury verdicts favorable to Newegg. Many are currently pending.

Almost without exception, the dozen or so patent infringement cases that have been brought against Newegg in the past several years each include the following set of

characteristics: multiple, and usually at least a dozen, other e-commerce companies were also sued under the same patent; the patent was filed and issued a considerable amount of time before the lawsuit was brought; the plaintiff does not itself offer products or services which practice the patent—i.e., the plaintiff is not a "solution provider"; and the plaintiff is an entity which in no way, shape, or form competes with Newegg in the e-commerce space. Furthermore, the plaintiff always appears to have no genuine interest in bringing the patented technology to market, only in being compensated for the technology's already-existing use in the marketplace. That our experience with patent litigation is limited to these types of cases should immediately raise concern over the present state of the patent system.

While the FTC's and DOJ's investigation refers to this class of NPEs as "patent assertion entities," I believe that the term "patent troll" is more appropriate. A "troll," as in the under-a-bridge fairy tale figure that blocks one's way across a bridge without some payment (or worse, a fight), is the perfect term for this class of NPEs.

Bridge trolls have one thing to offer—a right of way. The trolls have the ability to stop passers by unless they fight their way across or pay the fee demanded by the troll. It matters not to the troll why one requires passage, nor does the troll care that one's passage causes no actual harm to the troll or the bridge. All that matters to the troll is that this is their bridge and you should pay to cross it or prepare for a fight that could cost you dearly.

So it is with patent trolls. A patent is essentially no more than a right of way. As a mere patent owner, a patent troll has nothing to offer or license except the right not to be sued under the patent. 35 U.S.C. § 154 (defining a patent as "a grant . . . of the right to exclude others" from practicing the invention). Patent trolls control the particular rights of way that are the inventions encompassed by their patents, and anybody that a patent troll believes is using those inventions will be faced with the same "pay or fight" situation. Never mind that the patent troll does not participate in the marketplace for the patented invention, or even compete with the company that it is suing, and that therefore the patent troll suffers no actual harm even if infringement of the patent is actually occurring.

Turning again to online commerce, a patent troll's patent or even entire patent portfolio never covers even a significant fraction of the many technologies a multi-faceted website such as Newegg's employs. Rather, each patent at most will cover some small and singular component, feature, or aspect of a much larger system as a whole. This is because nobody single-handedly invents "e-commerce," but only at most invents certain specific ways of improving and implementing it. For example, a patent may relate to a particular form of text or searching or browsing, a unique way of aggregating shopping selections into a shopping cart, or a certain algorithm for encryption to protect sensitive payment information.

In the patent troll's imagination, these individual minor features are the primary reason, if not *the* reason, for an online retailer's success. "Without this feature," so says

the troll, "Newegg could not stay in business." The more modest trolls may advance the still-extreme view that "without this feature, Newegg would lose 25% of its sales." Invariably, the trolls want a substantial percentage of Newegg's razor-thin profit margins as "damages." This is true despite the fact that none of the above-mentioned "solution providers" tie the price of their products or services to Newegg's revenue, much less Newegg's profit. The trolls ignore the fact that Newegg's customer loyalty and satisfaction is off the charts, that its prices are incredibly low, and that Newegg's website includes multitudes of attractive and useful features for every one feature that might be encompassed by the troll's patent.

Newegg's (and any online retailer's) success is not entirely or even substantially due to any single technical feature. Success comes from an aggregate set of circumstances. If the trolls were correct that Newegg is successful due to, for example, its textual search box, then every website having that same commodity-type feature of a search box would be selling billions of dollars of merchandise each year like Newegg does. But they do not. Most of the thousands, perhaps millions, of online retailers around today cannot ever hope to achieve Newegg's good fortune, and it is because Newegg's success hinges not on a textual search box but on a tremendous amount of hard work, investment, ingenuity, and corporate management that most others lack. Newegg's unique form of a value-added shopping experience—the total package—makes it successful. If Newegg were to pay even a fraction of the percentage of its profits that are demanded by each patent troll, such payments would quickly swallow up all of Newegg's profits, and would incentivize the filing of even more lawsuits against Newegg.

While the damages law is evolving to help rein in outlandish jury awards for infringement of minor website features, more work remains to be done in the courts to ensure that a supposed "reasonable royalty" is indeed reasonable. For too long trolls have been unregulated in the permissible scope of their damages theories, but recent decisions of the Federal Circuit (e.g., *Lucent, ResQNet, Uniloc,* and *LaserDynamics*) are forcing patentees to deal with economic realities when asking for an amount of damages, rather than taking a "shoot for the stars and hope for the moon" approach before the jury. The very notion that damages should be based on a percentage of Newegg's profits— profits that come solely from the sales of goods *not* covered by the troll's patent—rather than on the basis of the inherent market value of the website feature standing alone (e.g., by looking to the cost of obtaining or implementing the patented software functionality), is something that must be purged from the law if we ever hope to securely ground patent damages to sound economic principles.[1]

---

[1] To be clear, Newegg has sometimes been sued by trolls in the district courts and the International Trade Commission where an actual product being sold by Newegg, not a website feature, is accused of infringement. While these cases share virtually all of the same characteristics of any other case brought by a troll, where website features are accused of infringement the damages law is more vulnerable to being egregiously misconstrued and misapplied by the trolls in attempt to justify their exorbitant damages calculations. Thus, my comments focus on the trolls that assert patents directed to Newegg's website features since such trolls present uniquely burdensome and anti-competitive harms to online retailers.

IV.   Ways Across a Patent Troll's Bridge

As noted above, when faced with a patent troll's infringement complaint, the options are to pay or to fight. Usually the troll first wants to talk about settlement, and offers in some cases a reduced price if the defendant settles right away. The merits of the case rarely come up in these settlement discussions. When they do, the troll will typically in a single phrase summarize the accused feature of Newegg's website (e.g., "keyword search" or "SSL encryption") and deem it infringing without further explanation. No requests are made to learn more about how Newegg's back-end systems actually work, let alone to compare such information to the patent claims. Newegg's attempts to focus the discussion on the merits are invariably dismissed without any satisfying rebuttal points.

In every instance that Newegg has been sued by a troll, Newegg has found the case to be without merit and would prefer to prove its noninfringement or invalidate the patent in court. However, where the cost of defense greatly outweighs the settlement offers that are made by the troll, Newegg has sometimes had no reasonable option other than to settle and allow meritless claims to remain untested in court. Thus, the troll and its patent survive to shake down another victim. This is the most common approach made by the troll to reach a settlement—set the settlement price low enough that defendants deem it in their best interest to just pay up, regardless of the merits or lack thereof. One troll was so blunt as to explain to Newegg that it was pricing its settlement offer "well below the pain level"—i.e., below the price where it may be worthwhile for Newegg to defend instead of settle. Most troll cases are brought against many market participants at the same time so that the early settlers can fund the litigation against those who are bold enough to defend themselves. The trolls depend on these early settlements, especially since they are the trolls' only source of income.

Since multiple defendants are often sued together, joint defense groups typically form to help control the cost and burden of defense, and some defendants will even be represented by the same firm to help share costs and fees directly. However, unless defendants are all jointly represented by a single firm, they still will be paying a disproportionately high amount of fees to defend the case. The singular troll, on the other hand, has a single firm representing it with respect to all defendants, achieving optimal efficiency and cost savings. Defendants invariably end up with more law firms involved because many, if not most, defendants will retain their own trusted litigation counsel. This results in higher overall litigation expenses for each defendant even where multiple defendants are sued together, which facilitates the early settlements that the trolls depend upon for revenue.

This disproportionate cost of defense per defendant is compounded by the fact that litigation burdens tend to be far greater for defendants in general. This is because the trolls are typically mere holding companies that acquired the patents from the individuals or entities that actually invented the subject matter and sometimes even participated in the market for the invention. The troll itself usually possesses little to no knowledge or documents concerning the invention, the prior art and patent prosecution, or any products

5

previously made and sold under the patent. Defendants must subpoena third parties to obtain the necessary information and documents on these topics. Moreover, the online commerce-related patents tend to be old, often filed 10 to 15 years ago, and it can be difficult to find the appropriate witnesses and documents. By contrast, defendants possess a wealth of information about their own accused systems, and are requested to prove how those systems worked from the date the patent issued through the present. In short, the amount of discoverable information from defendants can be immense, and it is very costly to comply with the discovery obligations.

Due to the age of the patents that are most often asserted by trolls, the patents are usually drafted and directed to technology that has not been in commercial use for over a decade. It should be unsurprising that modern websites no longer use the same protocols and systems that were common in 1995, and yet these are the kinds of claims against which Newegg defends. Unfortunately, the vague and seemingly broad language of the patent claims can make it difficult to get a judge or jury to appreciate the fundamental differences between the patented system and modern technology, which is complex enough to discern even without the overlaying patent law principles at issue. I believe that many trolls opportunistically seek to acquire and assert patents solely for the reason that their claim language on its face looks and sounds like modern technology, regardless of what the fair scope of the invention actually is. In fact, some trolls that have targeted Newegg have sophisticated patent prosecution practices that keep continuing patent applications alive for the sole purpose of restructuring claims to make them sound more like the technology that the troll intends to accuse. Other trolls go so far as to establish a network of independent shell holding companies that each own only one or two patents, effectively turning the troll into multi-headed hydra that keeps coming back even when one patent or company is defeated.

V.      Ways Around a Patent Troll's Bridge

Trolls deny that there is any other commercially viable way to implement the same or similar functionality covered by their patent—i.e., another way to cross the river without using the troll's bridge. According to the trolls, their patents are so "foundational" or "fundamental" to e-commerce that there is no possible way to accomplish the same objective as the patent without infringing it. However, non-infringing alternatives or design-arounds almost always exist as a matter of technological reality, whether by changing to an alternative existing system or by adopting a system previously licensed under the patent. Patent claims cover only the specifically claimed subject matter and almost never preclude one from obtaining the same effect in a significantly different way outside the scope of the claim, or via a licensed alternative. Proving such theories in court can be nuanced and a difficult thing to do, but even if a party has a strong position about a way to get around the troll's bridge, it is sometimes not pursued because it can be perceived as an admission of guilt. If an accused infringer could have done something differently and not infringed the patent, the question may arise in the jury's mind as to why the accused infringer did not choose to do just that.

The simple and obvious reason is that the online retailers that are accused of infringement are almost always completely unaware of the patent being asserted against them until after a complaint is filed in court. Newegg and its e-commerce competitors are not in the business of technology development and generally do not affirmatively seek out possible patents that could be asserted against them. As is true in any industry, Newegg's success depends in part on keeping an eye on its competitors to stay current, and Newegg's competitors are retailers that are not generally in the business of obtaining patents. Perhaps this relative lack of patent-sensitivity in the retail sector stems from the fact that for generations retailers needed only ensure that they had traditional indemnity and warranties from their suppliers and vendors, which obviated concerns of patent infringement. If a product sold by the retailer were alleged to be infringing, the supplier would step in and defend the retailer. Trolling is a relatively recent phenomenon, however, which points more often to the website than the products being sold. Where indemnity clauses concern a software vendor, usually that vendor provides only a portion of the functionality of an entire multifaceted website, and it can be difficult to get such a vendor to agree that its software is implicated by the patent to trigger its indemnity obligations. Thus, Newegg has had very limited success in obtaining indemnification against patent trolls' claims.

VI. <u>Competitive Harm Caused by Trolling</u>

Newegg has spent millions of dollars in legal fees and costs to defend against baseless claims of infringement, and has been forced to budget millions more for the foreseeable future. These costs impede Newegg's ability to continue to provide the high quality service and low prices that Newegg offers to its customers, and that forms the core of Newegg's corporate philosophy. Spending enormous sums of money to be vindicated in the courts by exposing a troll's claim to be meritless is only satisfying in the hours following the excitement of the verdict—when the dust settles, Newegg has to face the fact that it still paid a tremendous toll to cross the patent troll's bridge. Of course, choosing to settle rather than to fight has its costs as well, including payment of whatever license fee is being asked. Settlement not only leaves the troll free to sue others on the same patent or to acquire new patents purportedly covering other website functions, but it provides the troll with funding to do so.

Regardless of whether the case is disposed of in court or by a settlement agreement, the outcome rarely mandates any change in how Newegg operates its e-commerce platform. It simply amounts to an expense incurred by Newegg, akin to a tax, which must be recovered elsewhere. This tax can result in higher prices for consumers, reductions in service, or other cutbacks. While Newegg's success has enabled it to create jobs for thousands of employees, the trolls' relentless lawsuits impede further job creation. Unfortunately, Newegg's story is a common one within the online retail industry. The immense and increasing financial burden caused by the trolls harms the e-commerce industry and the consumers alike. Moreover, the taxes imposed by the trolls are levied disproportionately against large and successful online retailers since they are the ones perceived to have deep pockets and be able to pay large settlements. Furthermore, online-only retailers such as Newegg and Amazon that have no brick and

mortar counterpart stores are uniquely burdened by such taxes that apply only in the e-commerce space.

Nevertheless, Newegg will continue to choose to fight rather than pay whenever possible. We would rather pay to defend our right not to be shaken down for creating a value-added business that has little or nothing to due with a troll's patent than fund what we view as a perversion of the American justice system. To me, a patent troll is an extortionist masquerading under the guise of an innovator, and the continued ability of these trolls to serially extort companies like Newegg reveals a serious fault in the patent law. If you keep feeding a stray dog, it will stick around.

The absurd notion that trolling is somehow pro-competitive because it creates a market for the sale and acquisition of patents raises the question of what competition is being promoted by such a practice and is it something that should be promoted. If the idea is to incentivize companies to invest in technology development for the sole purpose of generating patents that can be sold, this is a misguided suggestion where a troll is acquiring the patent from the innovator.

Trolls are not innovators and trolls do not invent anything. Nor do trolls promote others to invent or help bring nascent technology to market for at least the reason that the patents which are valuable to trolls are not related to new inventions but rather to old patents that, when interpreted properly, are obsolete. Furthermore, in targeting companies like Newegg that are not in the business of technology development, trolls do not incentivize the development or adoption of new technology that may improve upon and effectively design-around what does the patent cover. If a troll were to instead direct its attention to technology companies, such as the solution providers mentioned above, this might create some market pressure to design around the patent and bring new technology to market. However, trolls will rarely do this because it is far more lucrative to target the many technology users than the single technology supplier. This is because if the trolls were to target Microsoft, for example, over an allegedly infringing software product, a settlement with Microsoft would exhaust the troll's rights in the patent with respect to all of Microsoft's customer's using that product. The trolls would much rather obtain settlements from all of Microsoft's customers, and only then go after Microsoft, if at all, to maximize its profits.

The potential reward at the conclusion of a successful research and development endeavor is the monetization of the resulting product or service, particularly when the innovation is patented. The ongoing revenues from being the exclusive provider of an actual product or service should invariably dwarf the value of simply selling the patent. Unless, of course, that patent is sold to another market participant that will bring the product or service to market and thus derive value from the competitive advantage it affords. If a patentee has no interest in monetizing the *invention*, the value of the patent to that patentee is minimal and the patent may well end up in the hands of a troll for a relatively small sum. And so, instead of the invention being brought to market to help further innovation and competition, the trolls under color of law oppressively tax it. This is not pro-competitive—it is opportunism at its worst.

   Patents exist to incentivize innovation and build bridges to new technologies. Trolls stymie such innovation. The United States patent laws should focus on building new bridges, not staffing the old ones with trolls underneath.


Dated: December 8, 2012          /s/ Lee C. Cheng
                     Lee C. Cheng
                     Chief Legal Officer
                     Newegg Inc.